**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| JOAN SCHOELWER<br>on behalf of herself<br>and all others similarly situated, | CASE NO: 14-cv-00360<br><br>JUDGE: |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| OMEGA FLEX, INC.,<br>451 Creamery Way<br>Eaton, PA 19341 | |
| Defendant. | |

Plaintiff Joan Schoelwer ("Plaintiff"), by and through undersigned counsel, brings this action on her own behalf and on behalf of a Class of persons defined below against Defendant Omega Flex, Inc. ("Omega Flex"), and for her Complaint alleges, upon information and belief and based on the investigation to date of her counsel, as follows:

**NATURE OF THE ACTION**

1.       This is a statewide class action brought by Plaintiff pursuant to Rule 23 of the Federal Rules of Civil Procedure on her own behalf and on behalf of a Class of all similarly situated property owners, against Omega Flex. Omega Flex manufactured, distributed, supplied, and trained and certified the installers of TracPipe® corrugated stainless steel tubing ("CSST") throughout the United States, including in Ohio.

2.       CSST is an ultrathin, flexible piping used to transport natural gas within both residential and commercial structures.  It was developed as an alternative to the much thicker, more durable black iron pipe that has been used to transport gas within residential and commercial structures for more than a century.

3.     CSST was engineered from its conception as a system consisting of tubing, fittings, manifolds, protective shields, and other accessories designed specifically as a gas distribution network that must be installed into a structure.

4.     As a Pennsylvania trial court noted in upholding a nearly $1,000,000 verdict against Omega Flex for what the jury found to be a defect with TracPipe®, "[w]hile there is little doubt that corrugated steel tubing and its manifolds and fittings branded by [Omega Flex] as TracPipe are highly utilitarian, it is equally clear that safety cannot and should not become utility's stepchild.  TracPipe is a product that is designed, intended and manufactured to convey a highly dangerous and explosive substance, hydrocarbon gas, capable of causing serious damage, injury and even death if allowed to escape, or if exposed to an uncontrolled ignition source."[1]

5.     The TracPipe® CSST that is at issue in this litigation, also known as yellow CSST, is no longer available for sale in the United States.  Omega Flex pulled TracPipe® from the U.S. market in 2011[2] in favor of a product it had first introduced in 2007, TracPipe® CounterStrike®, which Omega Flex claims was "specifically designed and listed to reduce the potential for lightning related damage to the gas piping system."[3]

6.     According to Omega Flex's promotional brochure, "Lightning can be very unpredictable and strike almost anywhere at any time of day or night! Every year the US is hit by millions of lightning strikes and while only 18% of lightning fires occur in homes, they account

---

[1] *See Tincher v. Omega Flex, Inc*., Case No. 2008-00974-CA (Chester County Common Pleas, Pa. August 5, 2011) at 13 n.11, available at http://documents.jdsupra.com/4ca0e00d-b6c2-4e32-ba5d-8103a5313548.pdf, *aff'd Tincher v. Omega Flex, Inc*., No. 1472 EDA 2011 at 12 (Pa. Super. Ct. 2012). *Tincher* is currently on appeal to the Pennsylvania Supreme Court.
[2] At or around the time Omega Flex pulled TracPipe® from the U.S. market, it was "defending some thirty-two lawsuits wherein its TracPipe is alleged to have been ruptured by lightning ignition, causing property damage." *Id.* at 12 n.8.
[3] *See* http://www.tracpipe.com/Customer-Content/WWW/CMS/files/FGP630_Rev.3_12.pdf.

for 88% of associated civilian deaths, 77% of associated injuries and 70% of direct property damages!"[4]

7.     Omega Flex is correct that lightning can strike almost anywhere at any time.  As to a particular permanent structure, however, it is possible to measure the probability of a lightning strike.[5]  Critical to any such probability calculation is the recognition that the risk of lightning striking a structure is cumulative over time. As a result, a reasonable homeowner such as Plaintiff is justifiably concerned and acts reasonably when he or she inspects and remediates a home to ensure that CSST is properly installed because the risk of a lightning strike at or nearby a home over time is real and significant relative to the serious and potentially fatal degree of possible harm.

8.     Omega Flex's marketing materials also state, "Each year, new methods, materials and standards for home construction are developed.  While these new methods create efficiencies for contractors and accelerate the availability of finished housing, some of these methods have left mechanical systems increasingly vulnerable to the effects of lightning."[6]  The materials further state, "Gas piping systems present a unique problem because they convey flammable fuel gas which may add to the fire hazard if any system components fail …. Leakage can cause a fire or, potentially worse, if there is not an immediate fire, the resulting gas buildup can lead to a catastrophic explosion."[7]

---

[4] *See* http://www.tracpipe.com/Customer-Content/WWW/CMS/files/FGP-622_single_pages_Web.pdf, citing NFPA Fire Analysis and Research, Quincy, MA-Lightning Fires, December 2010.
[5] *See* "Determining the Probability of Lightning Striking a Facility," By R.T. Hasbrouck, PE, National Lightning Safety Institute, Revised 4/18/04, available at http://www.lightningsafety.com/nlsi_lhm/prbshort.html
[6] *See* "Lightning Safety Recommendations for Gas Piping Systems using TracPipe by OmegaFlex," available at https://web.archive.org/web/20041203195124/http://www.tracpipe.com/.
[7] *Id.*

3

9.      Despite the fact that Omega Flex pulled TracPipe® from the United States market in 2011 in favor of a product with 4900% more resistance to lightning strikes, it still maintains that the TracPipe® it sold prior to 2011 "is a safe product also, **but it has to be installed properly**."[8]

10.     This case involves Omega Flex's faulty design and manufacturing of TracPipe®, as well as its failure to provide adequate installation training, instruction, certification, and oversight for TracPipe® installers.  Omega Flex was aware no later than 2001 that its TracPipe® was not being "installed properly," and therefore was not safe, yet it continued to offer the product for sale to consumers such as Plaintiff until 2011.

11.     In particular, Omega Flex was aware of significant problems with how its TracPipe® was being "bonded" during its installation. "Bonding" is an electrical connection between conductive systems to establish electrical continuity and conductivity.

12.     There are two basic types of bonding.  Indirect bonding of CSST electrically connects it to the wiring system contained within an electrically powered appliance that is connected to the service panel via the equipment grounding conductor.  The purpose of this connection is to operate the over-current protection devices (circuit breakers) that are provided to protect the consumer from electrical shock.  Direct bonding electrically connects the gas piping system directly to the grounding electrode system of a building, and is intended to protect the connected systems from the impact of high voltage surges associated with lightning or dropped power lines.  This bonding connection consists of a clamp and bonding wire from the gas piping system directly to one of the grounding electrodes.  Direct bonding permits the gas piping system

---

[8] *See* March 9, 2012 Deposition of Omega Flex Senior Vice President of Manufacturing and Engineering Mark Albino, taken in *The Cincinnati Insurance Company v. Omega Flex, Inc*., Case No. 3:10-cv-670, Western District of Kentucky, Exhibit 6 to Doc. 57-3, pg. 109 (emphasis added) (hereafter "Albino Dep."). Plaintiff does not concede that TracPipe® is a safe product if it is "installed properly."

to be energized at or near the same voltage level of the building's electrical system and in unison with the voltage pulse caused by a direct or indirect lightning strike.

## OMEGA FLEX'S KNOWLEDGE OF
## YELLOW CSST'S DANGEROUS PROPENSITY

13.    In no later than 2001, Omega Flex learned that TracPipe® as installed in homes was being damaged by nearby lightning strikes, causing holes to develop in the product which resulted in fires.[9]   In particular, Omega Flex became aware of eight instances in Tennessee during 1999 and 2000 in which TracPipe® had been punctured by the energy from indirect lightning strikes.[10]  In response to these reports, Omega Flex sent two of its employees, Dean W. Rivest, P.E., Manager of Manufacturing and Engineering, and Bill Rich, Director of Codes and Standards, to Tennessee to investigate.[11]

14.    After they completed their investigation of the Tennessee TracPipe® failures, Mr. Rivest prepared a Report that concluded that in the six homes they examined, none had been bonded in accordance with Omega Flex's October 1999 design and installation guide.[12]  In the "Recommendations" section of his Report, Mr. Rivest recommended that "a licensed electrician bond all TracPipe® installations…."[13]

15.    Omega Flex apparently dismissed this recommendation from its own Manager of Manufacturing and Engineering, and upon information and belief, has never required as part of

---

[9] *See* January 11, 2012 Deposition of Dean W. Rivest, P.E., taken in *The Cincinnati Insurance Company v. Omega Flex, Inc.*, Case No. 3:10-cv-670, Western District of Kentucky, Exhibit 7 to Doc. 57-3 pg. 21, 30-37, 54-65 (hereafter "Rivest Dep.").

[10] *Id.*

[11] *Id.*

[12] *Id.*  See also Engineering Project Report – EPR2000-10, Lightning Investigation - TN, Exhibit 8 to Doc. 57-4 in *The Cincinnati Insurance Company v. Omega Flex, Inc.*, Case No. 3:10-cv-670, Western District of Kentucky.

[13] Rivest Dep. at 65; Engineering Project Report – EPR2000-10, Lightning Investigation - TN, Exhibit 8 to Doc. 57-4 in *The Cincinnati Insurance Company v. Omega Flex, Inc.*, Case No. 3:10-cv-670, Western District of Kentucky.  While this Recommendation implies that "page 18, Chapter 3 of the design and installation guide, dated October 1999" contains such a requirement, this appears to be incorrect.

its design and installation instructions that a licensed electrician bond all TracPipe® installations. In fact, when Omega Flex conducted a "followup to the original investigation"[14] of the 1999-2000 Tennessee TracPipe® failures, and issued a second report in 2003, that report did not include the recommendation to have a licensed electrician bond all TracPipe® installations.[15]

16.     Over the next few years, Omega Flex sent Mr. Rivest to other locations in the United States to examine instances where TracPipe® had failed due to lightning.

17.     As a result of these examinations, Mr. Rivest began creating a new CSST product for Omega Flex in 2002 because "obviously we knew we had some sort of issue going on with [TracPipe®] …," which he described as "[s]usceptibility due to nearby lightning strikes."[16]

18.     Mr. Rivest has testified that Omega Flex did not feel that bonding and grounding requirements were being uniformly enforced across the United States, so a decision was made to create a product that could better withstand the energy from indirect lightning strikes.[17]

19.     According to Mr. Albino, Omega Flex understood as a result of its investigations and research "that we needed to build a much more robust product" than TracPipe®.[18]

20.     Omega Flex employee Steven Treichel has confirmed that with respect to TracPipe®, "variations in codes and installations … were putting our product at risk and the public at risk."[19]

---

[14] Rivest Dep. at 130.
[15] *See* Engineering Project Report – EPR2003-07, Lightning Investigation - TN, Exhibit 9 to Doc. 57-4 in *The Cincinnati Insurance Company v. Omega Flex, Inc.*, Case No. 3:10-cv-670, Western District of Kentucky.
[16] Rivest Dep. at 163-166.
[17] *Id.*
[18] Albino Dep. at 75.
[19] *See* March 13, 2012 Deposition of Steven Treichel, taken in *The Cincinnati Insurance Company v. Omega Flex, Inc.*, Case No. 3:10-cv-670, Western District of Kentucky, Exhibit 5 to Doc. 57-3 pg. 58 (hereafter "Treichel Dep.").

21.     Mr. Treichel was referencing the fact that gas pipe installation, including CSST installation, is regulated by state and local building codes.  Some local jurisdictions simply adopt, in whole or in part, the National Electric Code ("NFPA 70") and the National Fuel Gas Code ("NFPA 54"), which are national model standards subject to updates approximately every three years.  Manufacturers of gas piping systems may impose their own requirements for the proper installation of their products as long as they are at least as strict as the applicable codes. Manufacturers such as Omega Flex must change their requirements for the proper installation of their products at least as often as the codes change, provided they continue to meet or exceed the applicable codes.

22.     Ultimately, Mr. Rivest helped create Omega Flex's CounterStrike™ (hereafter "CounterStrike I"), a product for which he holds the patent.[20]

23.     At the time CounterStrike I was under development, Omega Flex considered two possible avenues to create a more robust product that would better resist indirect lightning strikes.

24.     The first avenue considered was bolstering the product's dielectric strength. TracPipe® was designed with a dielectric insulative coating,[21] albeit a very thin one.[22]  One group of engineers at Omega Flex wanted to improve TracPipe® by making the coating thicker to increase its dielectric strength.[23]  However, after consulting with Lightning Technologies, a consultant, it was determined that increasing the dielectric strength would only make things

---

[20] Rivest Dep. at 163.
[21] Albino Dep. at 71-73.
[22] The trial court in *Tincher v. Omega Flex, Inc.* stated that TracPipe®'s wall was "equal to the thickness of 4 sheets of paper…."  *See Tincher v. Omega Flex, Inc.*, Case No. 2008-00974-CA (Chester County Common Pleas, Pa. August 5, 2011) at 2, available at http://documents.jdsupra.com/4ca0e00d-b6c2-4e32-ba5d-8103a5313548.pdf
[23] *Id.*

worse.  According to Mark Albino, "you end up building up higher energies and causing more destruction."[24]

25.     The other avenue considered, besides increasing dielectric strength, was to utilize a conductive polymer.  Omega Flex concluded that this was the appropriate way to proceed, and thus CounterStrike I was designed to contain a black urethane-based conductive jacket that allowed it to withstand more energy before it would breach.[25]

26.     In approximately July 2004, Omega Flex made CounterStrike I available for sale to certain portions of the country.  After approximately a year, the product became generally available to the public in 2005.

27.     At or near the time of its release to the public, Omega Flex developed marketing materials for CounterStrike I, including a brochure titled, "Lightning Safety Recommendations for Gas Piping Systems."[26]  In that pamphlet, Omega Flex stated, "To diminish the risk to gas piping systems presented by lightning strikes, Omega Flex research and development efforts have lead (sic) to CounterStrike [I], a product which is an effective but affordable tool in increasing the protection of CSST gas piping systems from the damage cause by lightning strikes."[27]

28.     Omega Flex advertised in this 2004 brochure that it tested CounterStrike I by duplicating in the laboratory "typical CSST field failures," during which it found that CounterStrike I exceeded TracPipe®'s ability to withstand electrical energy by 725%.[28]

---

[24] *Id*. at 72.
[25] Omega Flex discontinued CounterStrike I in 2007 when it launched the second generation product called TracPipe® CounterStrike® ("CounterStrike II").
[26] *See* https://web.archive.org/web/20041203195124/http://www.tracpipe.com/
[27] *Id.*
[28] *Id*.

29.     Notably, despite the fact that TracPipe® had been on the market since 1997, this was the first time Omega Flex had ever tested TracPipe®'s resistance to lightning.[29]

30.     Moreover, even though Omega Flex now knew definitely (in 2004) that TracPipe® was 725% less able to withstand electrical energy than CounterStrike I, that TracPipe® needed to be properly installed to be safe, and that TracPipe® was not being properly installed, Omega Flex continued to sell TracPipe® in the United States until 2011.

31.     One of the reasons Omega Flex did not pull TracPipe® from the market in 2004 was "Because [Omega Flex] did not have a steady supply stream to replace TracPipe, number one."[30]  Although Omega Flex asserts that it needed time to test CounterStrike I before it could remove TracPipe® from the market, "after the first year, we kind of just opened it up and allowed anyone to buy it that wanted to buy it."[31]

32.     Therefore, no later than 2005, 2 years before TracPipe® was installed in Plaintiff's home, the supply of  CounterStrike I was no longer an issue, and Omega Flex could have removed TracPipe® from the market in favor of  CounterStrike I, a product that was 725% more resistant to electrical energy.

33.     Moreover, while OmegaFlex was publicly touting CounterStrike I's improved ability to withstand lightning, it was working behind the scenes to design CounterStrike I's replacement.

34.     OmegaFlex's research in or around 2004 showed that indirect or nearby lightning strikes generate electrical energy ranging between 2 and 3 coulombs.[32]   The addition of CounterStrike I's urethane-based conductive jacket, however, only increased the product's

---

[29] *See* Treichel Dep. at 57.
[30] Albino Dep. at 91-92.
[31] *Id*. at 93.
[32] Albino Dep. at 71.

9

ability to resist damage from electrical current from .12 (TracPipe®) to 1 coulomb (CounterStrike I).[33]  Consequently, while CounterStrike I was more resistant to damage from electrical arcing, it still needed to be installed in the same manner as TracPipe®.

35.    The fact that CounterStrike I required the same bonding as TracPipe® was concerning to Omega Flex because it knew that TracPipe® was not being properly bonded.[34]

36.    Therefore, Omega Flex continued to work to develop a more robust CSST product that did not require the additional bonding of TracPipe® and CounterStrike I.  Omega Flex eventually reformulated the CounterStrike I design to include a new polyethylene-based jacket.  The new jacket increased the CSST's ability to resist damage from transient electrical arcing up to 6 coulombs, which is 3 times the estimated electrical energy generated in a home by an indirect or nearby lightning strike.[35]  As a result, Omega Flex maintains that CounterStrike II can be safely installed without the need for additional bonding to protect against transient electrical arcing, such as caused by indirect or nearby lightning strikes.[36]

37.    Omega Flex now touts CounterStrike II as "[t]he only gas piping that withstands the forces of Nature!" and claims that CounterStrike II was "specifically designed and listed to reduce the potential for lightning related damage to the gas piping system."[37]

38.    It was only after Omega Flex had what it believed to be a replacement product ready to take over for TracPipe® that it pulled it from the U.S. market:  "The reason we discontinued TracPipe was because we had completed our evaluation on CounterStrike [II]."[38]

---

[33] *See* https://web.archive.org/web/20041203195124/http://www.tracpipe.com/
[34] *See* Defendant Omega Flex, Inc.'s Memorandum of Law in Support of Motion in Limine To Exclude Evidence of Subsequent Remedial Measures, in *The Cincinnati Insurance Company v. Omega Flex, Inc*., Case No. 3:10-cv-670, Western District of Kentucky Doc. 57-2, pg. 10-11.
[35] *Id*. at 9.
[36] *Id*.
[37] *See* http://www.tracpipe.com/Customer-Content/WWW/CMS/files/FGP630_Rev.3_12.pdf.
[38] Albino Dep. at 109.

39.     But Omega Flex's removal of TracPipe® from the U.S. market in 2011 does not remedy the fact that for nearly 10 years Omega Flex sold TracPipe® even though it knew TracPipe® was not being properly bonded, and was therefore dangerous.  Accordingly, many thousands of homes in Ohio have TracPipe® that is not properly bonded, and is dangerous.

40.     Moreover, even if TracPipe®'s trained and certified installers actually followed Omega Flex's installation instructions when installing the product, TracPipe®'s bonding requirements have become more stringent over the years.   Therefore, many homes and businesses contain TracPipe® that was bonded in accordance with instructions that Omega Flex provided at the time of installation, but no longer deems appropriate, and that violate Omega Flex's current installation instructions, current model standards, and current building codes.

41.     Omega Flex issued what it calls improved installation instructions for TracPipe® in at least March 2003, July 2004, January 2005, December 2005, March 2007, December 2007, February 2009, June 2009, and September 2011.[39]

42.     In particular, the 2009 National Fuel Gas Code (section 7.13.2 of the 2009 edition of the NFPA 54), also referenced in info note 2 in section 250.104 of the 2011 edition of the NFPA 70: National Electric Code, is currently deemed to define "proper bonding" of CSST, including TracPipe®.  Omega Flex's January 2014 installation instructions still refer to these standards as providing mandatory requirements ("Non-conductive jacketed CSST systems or systems that contain non-conductive jacketed CSST must be additionally bonded per the 2009 or later edition of the UPC, IFGC or NFPA-54.").

43.     The 2009 model codes contained significant changes from prior versions.  The 2009 edition of the NFPA 54, National Fuel Gas Code, included new requirements for direct

---

[39] *See* Defendant Omega Flex, Inc.'s Memorandum of Law in Support of Motion in Limine To Exclude Evidence of Subsequent Remedial Measures, in *The Cincinnati Insurance Company v. Omega Flex, Inc*., Case No. 3:10-cv-670, Western District of Kentucky, Doc. 57-2, pg. 3.

bonding of CSST to the grounding conductor of the building's electrical system.  Based in part on these new model codes requirements, Massachusetts, which had rescinded approval for CSST installation in the state on November 26, 2008, reversed itself and reinstated previously approved CSST products in the state.[40]

44.     However, many homeowners, including Plaintiff, had their TracPipe® installed pursuant to Omega Flex's earlier, less protective design and installation instructions.

45.     The 2009 model code changes were not a panacea, however.  The State of New Hampshire Department of Safety continued to question the safety of CSST even after the new changes were passed, in large part because it doubted that these changes were being effectively communicated to CSST installers.[41]

46.     The NFPA 54, section 4.1 requires that "Installation, testing, purging, and replacement of gas piping, appliances, or accessories, and repair and servicing of equipment, shall be performed only by a qualified agency."  Section 3.3.85 defines "qualified agency" to mean "Any individual, firm, corporation, or company that either in person or through a representative is engaged in and is responsible for (1) the installation, testing, or replacement of gas piping or (2) the connection, installation, testing, repair, or servicing of appliances and equipment; that is experienced in such work; that is familiar with all precautions required; and that has complied with all the requirements of the authority having jurisdiction."

47.     The Supplement to the 2002 National Fuel Gas Code required that, **"[t]he CSST Manufacturer is also responsible for** preparing and distributing a set of design and installation instructions, as well as **the training of all installers**.  The installation instructions must be

---

[40] See http://www.mass.gov/ocabr/government/oca-agencies/dpl-lp/regarding-corrugated-stainless-steel-tubing-csst.html
[41] http://www.nh.gov/jtboard/TechnicalBulletinonCSST7-16-09.pdf

revised and reprinted as needed and … the trained installers kept abreast of all pertinent changes to the hardware, installation practices or sizing methods."[42]

48.     In accordance with these requirements, Omega Flex trained and certified its TracPipe® installers.  Omega Flex has previously stated that it "requires that installers take a class on how to properly install its CSST.  This class is based on the Design Guide and Installation instructions.  It consists of a classroom portion, which is then followed by a written examination.  Upon completion of the course and passing the exam, the installer is given a card to show that he or she has completed the course.  ***Only those individuals qualified to install TracPipe® may install it.*** Stated otherwise, a distributor is not to sell TracPipe CSST to someone who has not taken an instructional course."[43]

49.     Yet as the New Hampshire Department of Safety noted in a July 1, 2009 Technical Bulletin on CSST, "the State Fire Marshal's Office has expressed deep concerns over the continuing education and requalification procedures for CSST Installers.  Currently the CSST industry has little if any verification procedures in place that demonstrate any of their previously trained installers have been retrained or certified in the proper bonding procedures and or recent changes in product updates." [44]  The Technical Bulletin also states, "The CSST industry training has raised serious questions as to its validity when qualifying technicians to properly install these piping systems.  Rumors of 'tailgate training' and self corrected tests have diminished the level of expertise for all installation technicians.  The fact that so many industry changes have occurred with respect to the bonding alone lays suspect to the quality of training that technicians have been receiving. *** The distribution of pertinent information with respect to Technical

---

[42] *Id.*, quoting 2002 National Fuel Gas Code, Supplement, at ¶6 (emphasis added).
[43] *See* Defendant Omega Flex, Inc.'s Response to Plaintiff's Motion in Limine To Bar Any and All References to Electrical Bonding in *The Cincinnati Insurance Company v. Omega Flex, Inc*., Case No. 3:10-cv-670, Western District of Kentucky, Doc. 73, pg. 21-22 (emphasis added)
[44] http://www.nh.gov/jtboard/TechnicalBulletinonCSST7-16-09.pdf

Bulletins, product enhancements, listing upgrades, and industry related changes is extremely flawed. Numerous technical bulletins have never reached installation technicians or inspection agencies leaving large gaps in education and compliance."[45]

50.     Indeed, while Omega Flex is aware that certain installers have failed to comply with its CSST installation instructions, and while it has the ability to revoke the certifications of its installers at any time, according to a deposition taken of Omega Flex employee Arthur Weirauch on March 2, 2012, it has never exercised that right.[46]    Mr. Weirauch further testified as follows:

Q:     Now, you agree that the [Omega Flex] design and installation guide has changed over time from the first issuance of TracPipe until the present time, correct?

A:     Yes.

***

Q:     Other than simply providing new versions of the design and installation guide to wholesalers and making it available on the website, were there any other steps taken by Omega Flex to make installers aware of changes in the design and installation guide?

A:     No.[47]

51.     Moreover, the certification cards Omega Flex provides to its trained installers have no expiration date, meaning an installer who was trained by Omega Flex to bond TracPipe® in accordance with Omega Flex's outdated 1999 installation instructions could still

---

[45] *Id.*
[46] *See* Exhibit 7 to Plaintiff's Brief in Opposition to Defendant's Motion in Limine to Exclude Evidence of Subsequent Remedial Measures in *The Cincinnati Insurance Company v. Omega Flex, Inc*., Case No. 3:10-cv-670, Western District of Kentucky, Doc. 66, pg. 45-47.
[47] *See* March 2, 2012 Deposition of Arthur Weirauch, taken in *The Cincinnati Insurance Company v. Omega Flex, Inc*., Case No. 3:10-cv-670, Western District of Kentucky, Exhibit 3 to Doc. 73-3, pg. 37-38 (hereafter "Weirauch Dep.").

present that certification card to a municipal inspector today, or present the card to a distributor and purchase new TracPipe® if it were still on the market.[48]

52.    According to the New Hampshire Department of Safety, "The CSST industry remains hesitant to address the miles of existing piping systems currently in use in the State of New Hampshire. Without some type of training and notification brochures produced by the CSST industry the State Fire Marshal will have little recourse but to produce an informational campaign to address the safety concerns of the CSST systems currently in use without the benefit of bonding for lightning protection."[49]

53.    And that is exactly what happened.  In 2012, the New Hampshire Fire Marshal was a driving force behind a campaign by the National Association of State Fire Marshals ("NASFM").  The "Yellow CSST Safety Campaign" was designed "[t]o raise awareness of proper bonding of yellow corrugated stainless steel tubing to the National Fire Protection Association Code."[50]  In a press release that accompanied the campaign's launch, the NASFM stated, "**In the last few years, the manufacturer's instructions and national building codes have changed with respect to requirements for bonding and grounding CSST in new installations.  As this is a safety improvement, NASFM is working to bring awareness to existing homeowners who may already have CSST installed, so they have the opportunity to have their structures inspected and upgraded to the new specifications**."[51]

54.    On June 6, 2012, S. Res. 483 was introduced into the second session of the 112th United States Congress to "Commend[] efforts to promote and enhance public safety on the need

---

[48] *See* Weirauch Dep. at 26 (Q: "So if a person were to attempt to go out and purchase TracPipe today, if it were still on the market, purchasing CounterStrike, for example, they would still need a certification card?"  A:  "Yes.")
[49] http://www.nh.gov/jtboard/TechnicalBulletinonCSST7-16-09.pdf
[50] http://thomas.loc.gov/cgi-bin/query/z?c112:H.RES.638:
[51] http://www.csstsafety.com/CSST-NASFM-statement.html

for yellow corrugated stainless steel tubing bonding."[52]  S. Res. 483 noted that "the National Association of State Fire Marshals is working to educate relevant stakeholders, including fire, building, and housing officials, consumers, homeowners, and construction professionals about **the need to properly bond yellow CSST in legacy installations and in all new installations in accordance with the most recent building codes and manufacturer installation instructions**."[53]  S. R. 483 further noted that "**the bonding of yellow CSST in legacy installations is an important public safety matter** that merits alerting homeowners, relevant State and local fire, building, and housing officials, and construction professionals such as electricians, contractors, plumbers, inspectors, and home improvement specialists."[54]  Through S. R. 483, the Senate resolved to "encourage[] further educational efforts for the public, relevant building and housing officials, consumers, homeowners, and construction professionals on **the need to properly bond yellow CSST retroactively** and moving forward in houses that contain the product."[55]

55.     As part of the Yellow CSST Safety Campaign, the National Association of State Fire Marshalls worked together with CSST manufacturers to make recommendations to homeowners regarding the yellow CSST (including TracPipe®) present in their homes.  These recommendations were posted on a website, www.csstsafety.org, and in various press releases and materials distributed to state and local governments.

56.     For example, the Norwich Township Ohio Fire Prevention Department issued the following statement: "Norwich Township in cooperation with the National Association of Fire Marshals urges all property owners with buildings and homes constructed after 1989 with yellow

---

[52] http://www.gpo.gov/fdsys/pkg/BILLS-112sres483ats/pdf/BILLS-112sres483ats.pdf
[53] *Id.*(emphasis added).
[54] *Id.* (emphasis added).
[55] *Id.* (emphasis added).

CSST installed to have the tubing checked for proper bonding and grounding. ***  Although previous installations of yellow CSST prior to 2009 were installed to code requirements at the time of their installation, **it is recommended that these systems be checked for proper grounding to meet the current building codes and manufacturer's requirements and ultimately to enhance your safety**."[56]

57.     Additional government entities, such as the State of New Hampshire Department of Public Safety, have issued similar warnings:  "Examine your homes fuel gas system to identify if this product is present …. **If the yellow coated CSST product is present schedule an appointment to have the lightning protection bonding jumper installed**. *** Do not delay; check your home for safety today."[57]

58.     The Minnesota Department of Public Safety issued a press release on July 8, 2013 titled, "Yellow Corrugated Stainless Steel Tubing a Fire Risk if Not Properly Installed."[58]  The press release in part states, "fire officials want Minnesotans with homes built after 1989 to check for corrugated stainless steel tubing (CSST) – a flexible pipe that, if not properly installed, can be damaged by nearby lightning strikes and start a fire. *** **If you find CSST after inspecting your home or business, you should contact a licensed electrician to determine if the tubing is properly installed**."[59]

59.     Even Omega Flex's own website, www.csstfacts.org, states, "If you are concerned that the system may not be properly bonded, the assistance of a qualified electrician

---

[56] http://www.norwichtownship.org/prevention-more-i-27.html (emphasis added).
[57] http://www.nh.gov/safety/divisions/firesafety/building/plumbing/documents/CSSTInformationalBulletin7-2012.pdf (emphasis added)
[58] https://dps.mn.gov/divisions/ooc/news-releases/Pages/Yellow-Corrugated-Stainless-Steel-Tubing-a-Fire-Risk-if-Not-Properly-Installed.aspx
[59] *Id.* (emphasis added)

may be required to perform the inspection, as well as upgrade per the manufacturer's bonding instructions and local codes."[60]

60.     While Omega Flex is willing to admit that an inspection and upgrade may be required, it asserts that it is the homeowner who should bear the costs.  The trade magazine Electrical Construction and Maintenance wrote a story on the NASFM campaign in October, 2012 titled, "Whose Job Is It to Bond Corrugated Stainless Steel Tubing (CSST)?"[61]  As part of that article, Robert Torbin, director of codes and standards for Omega Flex, was quoted:  "'This is an opportunity for electrical contractors,' says Torbin, who urges them to think of the NASFM campaign as basically an open bid to the electrical community, particularly with retrofit projects in certain parts of the county that experience more lightning density [].  '**There are millions of homes in the United States that have the yellow CSST that was installed before the year 2007,' says Torbin.  'According to NASFM, many of these homes should be inspected, and, if necessary, upgraded to current requirements.' *** 'From a revenue point of view, it's easy money because it's well-defined.  It's a requirement within the jurisdiction**.'"[62]

61.     This action alleges that Omega Flex improperly designed, manufactured, sold, and distributed TracPipe® and failed to properly instruct, certify, and re-certify its trained installers. As a result, thousands of homes in the State of Ohio contain TracPipe® that is not "properly bonded" and/or properly installed, and is therefore not safe.

## THE PARTIES

62.     Plaintiff Joan Schoelwer is the owner of a house located in Cincinnati, Ohio. TracPipe® CSST was installed in Plaintiff's house in 2007 to supply natural gas to her stove and other appliances.

---

[60] http://www.csstfacts.org/csst-faqs.aspx
[61]  http://ecmweb.com/bonding-amp-grounding/whose-job-it-bond-corrugated-stainless-steel-tubing-csst
[62] *Id.* (emphasis added)

63. Plaintiff, on behalf of herself and all other persons and entities similarly situated, brings this action for and on behalf of the owners of all residential and commercial structures located in Ohio with TracPipe®.

64. Defendant, Omega Flex, Inc. is a corporation organized and existing under the laws of Pennsylvania having its principal place of business and a headquarters located at 451 Creamery Way, Eaton, PA 19341.

65. At all times relevant hereto, Omega Flex was in the business of designing, manufacturing, testing, inspecting, distributing, marketing, installing, and selling CSST under the brand name "TracPipe®" and training and certifying installers of "TracPipe®"

## JURISDICTION AND VENUE

66. Between 2000 and 2011, CSST was installed in thousands of homes in Ohio, perhaps tens of thousands. Omega Flex has approximately 35% share of the CSST market. It follows that thousands of homes in Ohio were built with TracPipe® or had "TracPipe®" installed during this time period.

67. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2) (diversity jurisdiction), in that (i) there is complete diversity (Plaintiff is a citizen of Ohio and Defendant is incorporated in Pennsylvania, and to the extent pertinent, maintains its principal place of business in Pennsylvania, (ii) the amount in controversy exceeds $5,000,000.00 (Five-Million Dollars) exclusive of interests and costs, and (iii) there are 100 or more members of the proposed Plaintiff class.

68. Venue lies in this District, pursuant to 28 U.S.C. § 1391, because Plaintiff resides in this Judicial District, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this Judicial District. In addition, Defendant does business and/or transacts

business in this Judicial District, and therefore is subject to personal jurisdiction in this Judicial District and resides here for venue purposes.

## PLAINTIFF JOAN SCHOELWER'S EXPERIENCE WITH TRACPIPE®

69.     Plaintiff is the owner of a home located in Cincinnati, Ohio in which Omega Flex's TracPipe® was installed in 2007.

70.     Plaintiff, like other members of the Class, did not change or alter TracPipe® since the time it left Omega Flex's control.

71.     In a reasonable response to the public warnings made by entities including the NASFM, the CSST industry, State Departments of Safety, and other organizations discussed above, and in reasonable response to the changing installation instructions and improper, inadequate, and/or non-existent training, re-training, certification, and re-certification of TracPipe® installers by Defendant, Plaintiff had her home examined in 2013 to determine if the TracPipe® therein was properly bonded.

72.     Upon examination by a licensed contractor, it was determined that the TracPipe® in Plaintiff's home was not properly bonded.

73.     Therefore, in a reasonable response to the public warnings made by entities including the NASFM, the CSST industry, State Departments of Safety, and other organizations discussed above, Plaintiff paid $578 to have the TracPipe® in her home properly bonded on March 20, 2014.

74.     Plaintiff and members of the Class have suffered damages as a result of Defendant's practices, including (i) all out-of-pocket monies expended by members of the Class to have the TracPipe® in their homes or businesses examined to determine whether it is properly bonded, and if not, to have TracPipe® properly bonded; (ii) the failure of consideration in

20

connection with and/or difference in value arising out of the variance between TracPipe® as warranted and TracPipe® containing the defect; and (iii) the diminution of resale value of the residences and buildings resulting from the defect in TracPipe®.

## CLASS ACTION ALLEGATIONS

75.     Plaintiff brings this class action pursuant to Federal Rule of Civil Procedure 23 on behalf of herself and a Class defined as follows:

> All persons or entities in the State of Ohio who own a house, or other structure, in which Omega Flex's TracPipe® is installed.

Excluded from the Class are: (a) any Judge or Magistrate presiding over this action and members of their families; (b) Omega Flex and any entity in which Omega Flex has a controlling interest or which has a controlling interest in Omega Flex and its legal representatives, assigns and successors of Omega Flex; and (c) all persons who properly execute and file a timely request for exclusion from the Class.

76.     *Numerosity:* The Class is composed of thousands of persons in the State of Ohio, the joinder of whom in one action is impractical.  Between 2000 and the present, multiple thousands of homes in Ohio, perhaps tens of thousands, were constructed with CSST.  Omega Flex has approximately 35% share of the CSST market.  It follows that thousands of homes in Ohio were built or remodeled with TracPipe®.  Moreover, upon information and belief, the Class is ascertainable and identifiable from Omega Flex's records or identifying marks on the CSST.

77.     *Commonality:* Questions of law and fact common to the Class exist as to all members of the Class and predominate over any questions affecting only individual members of the Class.  These common legal and factual issues include the following:

> a.   Whether TracPipe® is inherently defective;

b.  Whether TracPipe® was in an unreasonably dangerous condition when it was manufactured and distributed;

c.  Whether TracPipe® was reasonably safe for its intended use as manufactured and designed;

d.  Whether TracPipe® was sold with installation instructions that were unsafe and unreasonably dangerous;

e.  Whether Omega Flex knew or should that TracPipe® was being installed in a manner that rendered it unsafe and unreasonably dangerous;

f.  Whether Omega Flex concealed from consumers and/or failed to disclose to consumers the defect with TracPipe®;

g.  Whether Omega Flex failed to properly train, re-train, certify, and/ or re-certify TracPipe® installers;

h.  Whether Omega Flex failed to adequately test for potential defects in TracPipe®;

i.  Whether Omega Flex failed to adequately warn of the foreseeable risks associated with using TracPipe®;

j.  Whether Omega Flex omitted critical information regarding defects in its product in its TracPipe® marketing, sales, and installation materials;

k.  Whether Omega Flex should be forced to notify Class Members that they should examine their TracPipe® to determine whether it is properly bonded;

l.  Whether Plaintiff and the Class are entitled to compensatory damages, including, among other things: (i) compensation for all out-of-pocket monies expended by members of the Class for examination of TracPipe® to determine whether it is properly bonded, and if not to have TracPipe® properly bonded; (ii) the failure of consideration in connection with and/or difference in value arising out of the variance between TracPipe® as warranted and TracPipe® containing the defect; and (iii) the diminution of resale value of the residences and buildings resulting from the defect in TracPipe®; and

m.  Whether Plaintiff and the Class are entitled to restitution and/or disgorgement.

78.  *Typicality:* Plaintiff's claims are typical of the claims of the members of the Class, as all such claims arise out of Omega Flex's conduct in designing, manufacturing, marketing, advertising, and selling the defective TracPipe®, Omega Flex's conduct in training and

22

certifying TracPipe® installers (and its failure to re-train and re-certify), and Omega Flex's conduct in concealing the defect in the TracPipe® to owners, contractors, developers, and suppliers.

79.     *Adequate Representation:* Plaintiff will fairly and adequately protect the interests of the members of the Class and has no interests antagonistic to those of the Class.  Plaintiff has retained counsel experienced in the prosecution of complex class actions, including consumer class actions.

80.     *Predominance and Superiority:* This class action is appropriate for certification because questions of law and fact common to the members of the Class predominate over questions affecting only individual members, and a Class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Class is impracticable.   Should individual Class members be required to bring separate actions, this Court and courts throughout Ohio would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments.   In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

## COUNT I
## STRICT LIABILITY – DESIGN AND MANUFACTURING DEFECT

81.     The allegations contained above are incorporated herein by reference as if fully set forth.

82.     At all times relevant hereto, Omega Flex was engaged in the business of designing, manufacturing, testing, inspecting, distributing, marketing and selling CSST piping

systems, including the TracPipe® CSST piping system installed at Plaintiff and Class Members' structures.

83.     At all times relevant hereto, TracPipe® was designed and placed into the stream of commerce by Omega Flex.

84.     Omega Flex designed, formulated, tested, manufactured, inspected, marketed, distributed, supplied and/or sold TracPipe® that was defective in design and/or manufacture when the product left the hands of the Defendant.  The foreseeable risk from installing TracPipe® under the circumstances described herein exceeded any potential benefits associated with the design and/or manufacture of it.

85.     TracPipe® manufactured by Omega Flex was expected to and did reach Plaintiff and Class Members' structures without substantial change in the condition in which it was designed, manufactured, tested, inspected, distributed, marketed or sold.

86.     Ultimately, TracPipe® designed, formulated, tested, manufactured, inspected, distributed, stored, marketed, supplied and/or sold by Omega Flex was defective in design and/or manufacture in that, when the product left the hands of the designers, manufacturers, distributors and/or suppliers, it was unreasonably dangerous and more dangerous than consumer would expect.

87.     Omega Flex knew, or should have known, that at all times mentioned herein, TracPipe® was inherently dangerous and unsafe because of its inability to adequately resist indirect lightning strikes when it was not properly installed and/ or bonded.

88.     Omega Flex knew, or should have known, that at all times mentioned herein, TracPipe® was not being properly installed and/ or bonded, including by its trained and accredited installers, and that it was therefore inherently dangerous and unsafe.

89.     Plaintiff and the Class, acting as reasonably prudent people, could not discover that TracPipe® was defective as mentioned herein, or perceive its danger.

90.     At the time of use of Omega Flex's TracPipe®, Plaintiff and the Class utilized TracPipe® for the purposes and manner normally intended.

91.     By reason of the foregoing, Omega Flex is strictly liable in tort to Plaintiff and the Class for designing, manufacturing, testing, inspecting, distributing, marketing and/or selling TracPipe®.

92.     Said defects in TracPipe® were a substantial factor in causing Plaintiff and the Class damages and injuries and/or placing Plaintiff and the Class members at increased risk of damage and/or harm.

93.     As a direct, proximate, and foreseeable result of the defective condition of TracPipe® as manufactured and sold by Omega Flex, Plaintiff and the Class have suffered, and will continue to suffer, damages including (i) all out-of-pocket monies expended by members of the Class to have the TracPipe® in their homes or businesses examined to determine whether it is properly bonded, and if not, to have TracPipe® properly bonded; (ii) the failure of consideration in connection with and/or difference in value arising out of the variance between TracPipe® as warranted and TracPipe® containing the defect; and (iii) the diminution of resale value of the residences and buildings resulting from the defect in TracPipe®.

<u>COUNT II</u>
<u>BREACH OF IMPLIED WARRANTY IN TORT</u>
<u>(COMMON LAW)</u>

94.     The allegations contained above are incorporated herein by reference as if fully set forth.

95.     Defendant is and was at all relevant times a merchant with respect to TracPipe®.

25

96.     A warranty that Defendant's TracPipe® was in merchantable quality and condition is implied by Ohio common law.

97.     Defendant impliedly warranted that its TracPipe® was of good and merchantable condition and quality – fit and safe for its ordinary intended use which would include, but not be limited to, safe delivery of gas within a structure.

98.     For all the reasons stated above, TracPipe® was defective at the time it left the Defendant's possession. Defendant knew of these defects at the time these transactions occurred. Thus, TracPipe®, when sold and at all times thereafter, was not in merchantable condition or quality and is not fit for its ordinary intended purpose.

99.     By virtue of the conduct described herein and throughout this Complaint, Defendant breached the implied warranty of merchantability.

100.    Plaintiff and the Class have been damaged as a direct and proximate result of Defendant's breach of the implied warranty.

101.    As a direct and proximate result of Defendant's breach of warranties, Plaintiff and the Class were caused to suffer economic damage, including (i) all out-of-pocket monies expended by members of the Class to have the TracPipe® in their homes or businesses examined to determine whether it is properly bonded, and if not, to have TracPipe® properly bonded; (ii) the failure of consideration in connection with and/or difference in value arising out of the variance between TracPipe® as warranted and TracPipe® containing the defect; and (iii) the diminution of resale value of the residences and buildings resulting from the defect in TracPipe®.

## COUNT III
## NEGLIGENT FAILURE TO WARN

26

102.    The allegations contained above are incorporated herein by reference as if fully set forth.

103.    At all times relevant hereto, Omega Flex was engaged in the business of designing, manufacturing, testing, inspecting, distributing, marketing and selling the TracPipe® CSST piping installed at Plaintiff's and Class Members' structures.

104.    At all times relevant hereto, TracPipe® was designed and placed into the stream of commerce by Omega Flex.

105.    At the time TracPipe® was designed and placed into the stream of commerce by Omega Flex, Omega Flex knew or had reason to know that TracPipe® was or was likely to be dangerous for the use for which it is supplied unless it was properly installed and bonded.

106.    At the time TracPipe® was designed and placed into the stream of commerce by Omega Flex, Omega Flex knew or should have known, prior to Plaintiff's installation of the TracPipe® in this case, that TracPipe® was inherently dangerous and unsafe because of its inability to adequately resist lightning strikes if not properly bonded, that TracPipe® was not being properly installed and bonded, and that when TracPipe® is not properly bonded it presents an unreasonable risk of failure when subjected to energy from an indirect lightning strike.

107.    At the time TracPipe® was designed and placed into the stream of commerce by Omega Flex, Omega Flex had no reason to believe that Plaintiff and the Class would realize TracPipe®'s dangerous condition.

108.    At the time TracPipe® was designed and placed into the stream of commerce by Omega Flex, Omega Flex failed to exercise reasonable care to inform Plaintiff and the Class of TracPipe®'s dangerous condition or of the facts which make it likely to be dangerous.

27

109.    As a direct and proximate result of Defendant's failure to warn, Plaintiff and the Class have suffered damages, as set forth herein.  Furthermore, Plaintiff seeks an Order requiring Omega Flex to notify Ohio homeowners of the need to examine their homes to see if TracPipe® is present, and if it is, to force Omega Flex to pay to properly bond the TracPipe® in compliance with Omega Flex's current installation instructions, current model code requirements, and/ or current building code requirements.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, and on behalf of all others similarly situated, prays for a judgment against Omega Flex as follows:

1.    For an order certifying the Class, pursuant to Rule 23, appointing Plaintiff as representative of the Class, and appointing the law firms representing Plaintiff as counsel for the Class;

2.    For compensatory damages for the harm and damages sustained by Plaintiff and the Class;

3.    For an Order requiring Omega Flex to notify Ohio homeowners of the need to examine their homes to see if TracPipe® is present, and if it is, to bond the TracPipe® in compliance with Omega Flex's current installation instructions, current model code requirements, and/ or current building code requirements;

4.    For an award of costs as allowed by law;

5.    For both pre-judgment and post-judgment interest on any amounts awarded;

6.    For payment of reasonable attorneys' fees and expert fees as may be allowable under applicable law; and

7.    For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

This the 5th day of May, 2014.

Respectfully submitted,


 */s/ Niroshan M. Wijesooriya*
Christian A. Jenkins (0070674)
Niroshan M. Wijesooriya (0079780)
Minnillo & Jenkins Co., LPA
2712 Observatory Avenue
Cincinnati, OH 45202
Telephone: (513) 723-1600
Facsimile: (513) 345-1620
cjenkins@minnillojenkins.com
niro@minnillojenkins.com

 */s/Jeffrey S. Goldenberg*
Jeffrey S. Goldenberg (0063771)
Todd B. Naylor (0068388)
Robert Sherwood (0084363)
GOLDENBERG SCHNEIDER, L.P.A.
One West Fourth Street, 18th Floor
Cincinnati, OH 45202
Phone:  (513) 345-8291
Fax:  (513) 345-8294
jgoldenberg@gs-legal.com
tnaylor@gs-legal.com
rsherwood@gs-legal.com

Attorneys for Plaintiff and the Class

29